

# AFTAB PUREVAL
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
April 2, 2021 02:55 PM
     AFTAB PUREVAL
    Clerk of Courts
  Hamilton County, Ohio
  CONFIRMATION 1051981
```

**LINDA JACOBS**             **A 2101158**

    vs.

**LORI WATSON**

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 14**

EFR200





COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| **LINDA JACOBS**<br>4750 Burley Hills<br>Cincinnati, Ohio 45243<br><br>Plaintiff,<br><br>vs.<br><br>**LORI H. WATSON**<br>**Individually and as Trustee of the Robert**<br>**J. Henderson Revocable Living Trust, As**<br>**Amended and Restated**<br><br>7866 Hickory Bottom Road<br>Naples, New York 14512<br><br>Defendant. | Case No. _____<br><br><br><br>**COMPLAINT WITH JURY DEMAND** |

For her Complaint against Defendant Lori H. Watson, Plaintiff Linda Jacobs ("Jacobs") states as follows:

**PARTIES, JURISDICTION & VENUE**

1. Jacobs is a resident of Hamilton County, Ohio, and is a vested residual beneficiary under the Robert J. Henderson Revocable Trust, as Amended and Restated (the "Trust").

2. Defendant Lori H. Watson ("Watson") is a resident of Ontario County, New York, is the co-trustee of the Trust, and is a vested residual beneficiary under the Trust.

3. This Court has jurisdiction over the subject matter of this action and personal jurisdiction over the parties because they transact business in the State of Ohio, caused tortious injury in the State of Ohio by act or omission, purposefully directed activities in the State of Ohio, or conducted activities in the State of Ohio.

4. Venue is proper with this Court pursuant to Ohio R. Civ. P. 3 because Defendant's

1

activities giving rise to these claims took place in this county, and this is the county in which all of the claims arose.

## ROBERT J. HENDERSON DEVELOPS AN ESTATE PLAN TO BENEFIT HIS FOUR CHILDREN

5. Robert J. Henderson ("Robert Henderson") was a very successful local businessman and the family patriarch. He had four children: Watson, Jacobs, Bobby Henderson, and Maria Henderson.

6. Robert Henderson's holdings included, among other things, a construction company known as Ford Development Corporation as well as a portfolio of real estate holdings and other investments.

## ROBERT HENDERSON'S DEATH AND ESTATE ADMINISTRATION

7. On November 1, 1991 Robert Henderson executed the Robert J. Henderson Revocable Trust (the "Trust"). Thereafter, Robert Henderson amended and restated the Trust agreement on several occasions.

8. On February 28, 2012, Robert Henderson executed the Second Restatement and Amendment to the Robert J. Henderson Revocable Living Trust Agreement ("Second Restatement"). The Second Restatement, which identified Robert J. Henderson as the initial trustee, Lori Watson as the alternate trustee, Bobby Henderson as the second alternate trustee, and Huntington National Bank as the third successor trustee.

9. The Second Restatement provided that $350,000.00 would go to Robert Henderson's girlfriend, Michelle Reffitt, if she survived Robert Henderson, that any outstanding shares of Ford Development Corporation would go Robert F. Henderson, that certain amounts from a life insurance policy would go to Lori Watson, the Trustee of RJ Henderson Irrevocable Trust dated November 1, 1991 an amount equal to the amount paid to Ford Development Corporation

2

pursuant to a Split Dollar Agreement.

10. Article 8 of the Second Restatement specifically provided that the balance of the Trust would be designated the "residuary trust." The residuary trust was to be divided into four equal shares, with Watson, Bobby Henderson and Jacobs each receiving their share outright, per stirpes, while's Maria Henderson's shares were held in trust with restrictions.

11. On February 6, 2014, Robert Henderson executed a First Amendment to the Second Restatement of the trust ("First Amendment"), which amended Article 7 to state that if Michelle Reffitt's relationship has continued with Robert Henderson, she shall receive $1,000,000.00 and the right to occupy the home at 4512 Morris Court, Mason, Ohio.

12. On August 24, 2015, Robert Henderson purported to execute a Second Amendment to the Second Restatement ("Second Amendment"). Article 7 again amended Michelle Reffitt's right to use the 4512 Morris Court until the sale of the home.

13. The Second Amendment amended Subsection 8.2 relating to distribution of the residuary trust. The amendment retained outright distributions of one-fourth shares to Lori Watson and Robert F. Henderson, but held Jacob's residuary interest in trust with discretionary distributions of income for health, education, maintenance or support. In addition, further distributions of principal and undistributed income can be made to Linda Jacobs for her comfort, benefit, best interest, welfare and happiness as determined by the trustee.

14. On October 6, 2015, Robert Henderson executed the Third Amendment to the Second Restatement ("Third Amendment"), wherein Watson and Bobby Henderson were identified as alternate or successor co-trustees of the trust.

15. Robert Henderson passed away on January 24, 2016 as a result of health complications.

**JACOBS' INTEREST IN THE TRUST IS MISMANAGED BY WATSON**

3

16. After the passing of Robert Henderson, tensions arose between Jacobs, Bobby Henderson and Watson as it related to the Trust.

17. Despite being named as alternate or successor co-trustee, Robert Henderson has played no role in the administration of the Jacobs' sub-Trust, and all communications regarding the Trust have been between Watson and Jacobs.

18. After receiving the April 6, 2016 letter and Trust documents, Jacobs contacted Watson on numerous occasions with questions concerning the assets that were included in Robert Henderson's estate, and the estimated amount of the residuary trust. Jacobs' requests were not answered, and were met with rebuffs, or with ambiguous answers that provided no insight.

19. When Jacobs would request information about the assets she believed should be in the Trust, Watson claimed it was none of her business and that "she didn't need to know."

20. Several months later, on August 4, 2016, Watson emailed Jacobs and provided a summary of assets that were to be included in Robert Henderson's estate tax returns, and advised that the residuary estate would total approximately $4.9 million.

21. On March 22, 2017 Watson and her husband, W. Mark Watson, met Jacobs in person to discuss the Trust. Jacobs was threatened because she retained legal counsel and was requesting documents and information about the trust assets. Jacobs was advised to cease and desist and "let this go" "from this day forward."

22. The trustees also exerted pressure on Jacobs by threatening to resign as trustees such that Huntington Bank would become the successor trustee so that Jacobs would "never get her money."

23. Jacobs retained counsel based upon the trustees' abject failure to provide information pertaining to the trust assets, and on March 3, 2017, counsel requested a report of the trust's

4

assets, liabilities and distributions.

24. Jacobs' ¼ interest in the Trust was placed in a sub-trust. The sub-trust consisted of several assets, one of which was an inherited IRA totaling $121,814.72 as of May 31, 2016 and held through Ameriprise Financial. That IRA held various mutual funds with a moderate growth objective. That IRA grew to nearly $177,810.32 as of December 31, 2020, all while taking required minimum distributions of approximately $6,000 per year. That equates to a 45% percent return on investment in just four and a half years.

25. However, the overwhelming majority of Jacobs' ¼ vested residuary interest in the sub-trust, was not invested at all, and was kept in cash, or in CDs.

26. On September 24, 2017, well over a year after Robert Henderson's death, Bobby Henderson texted Jacobs to advise that " there has been a distribution to your sub-trust. Lori being the trustee has all the paperwork." Around this time, approximately $1,000,000 in sub-trust monies were deposited with Ameriprise Financial.

27. On November 9, 2017, Watson emailed Jacobs concerning the potential formation of a new trust which Jacobs would control. Watson noted that "in talking with you it is my understanding that you want to invest the trust." Watson noted that despite her fiduciary duties as the trustee, "until this new trust is formed, I will not be held liable or responsible for the performance of the trust nor giving or withholding my consent."

28. Indeed, Jahn Gazder and Ameriprise retained in their system a client account document dated February 8, 2017, that defines Jacobs financial profile, risk tolerance and preference to invest .

29. In December 16, 2017, Jacobs provided to Watson a copy of a proposed trust agreement created by counsel. In January 2018, Watson, through counsel, returned a copy of the proposed

5

trust with revisions, which were unacceptable to Jacobs, and as such, negotiations ended.

30. Moreover, Jacobs had concerns about certain assets that were held in the Trust, including certain notes given by Bobby Henderson in exchange for an interest in Robert J. Henderson's real estate portfolio.

31. On August 6, 2018, Watson emailed Jacobs regarding her concern for not receiving a signed copy of Jacobs' new trust, despite eight months of silence and no response to letters from Jacobs' counsel. At that point, Watson finally agreed to allow Jacobs to execute her own Trust without revisions or restrictions, on the condition that Jacobs sign a release relieving her from all liability personally and as trustee. Further, the letter stated that if Jacobs persists requesting information and documents regarding Trust assets, the trustees threatened to charge Jacobs fees from her Trust. Jacobs was reluctant.

32. Watson re-stated that, despite her fiduciary duty, "she is not liable or responsible for the performance of the current trust" and that if she did not receive a copy of the new trust by September 15, 2018 "it will be my intention to resign as trustee and assign a new trustee." In a subsequent email, Watson advises that because the estate received a letter from Jacobs' attorney requesting financial information, that Watson "will not release your full distribution of the estate until you have signed a full release of the estate."

33. On October 4, 2018, Jacobs met with Jahn Gazder at Ameriprise and learned for the first time that the $1 million in the sub-trust was "virtually earning nothing." Prior to this date, Jacobs had not received statements or other documents from Watson reflecting how the trust funds were invested. Gazder suggested moving the money to, at a minimum, a money market account, where it would at least earn an additional $12,000 annually. Jacobs agreed, and asked for statements for the account as well as for the inherited IRA.

6

34. Having heard nothing from either Watson or Gazder regarding receipt of statements or transfer of the cash to a money market to earn at least some interest, Jacobs emailed Gazder on February 12, 2019, requesting statements, and requesting verification of the transfer to the money market accounts. Jacobs followed up again on February 22, 2019 on these issues.

35. That same day, Gazder advised that Ameriprise may only send information to Watson, and that Jacobs should contact her. Jacobs did just that, requesting that the money be placed in a higher interest .

36. On March 2, 2019, Watson advised Jacobs that "as requested by you, the higher interest yielding fund . . .to which the trust is to be transferred has become available" and that the transfer has been made. Again, Watson requests a release be signed so that Jacobs could be the trustee of her own trust. Again, because Jacobs had concerns about certain notes in the Robert Henderson Trust, she was reluctant. When discussion of transfer of the assets to a trust controlled by Jacobs didn't materialize, Watson nevertheless continued to mismanage the trust assets by failing to prudently invest them.

37. On November 4, 2019, Watson emailed Jacobs to advise that her sister Maria had signed the release and been provided her own trust with Maria as the trustee, which was fully funded by April 2018. Watson again requested a release.

38. On February 19, 2020, Ameriprise representative Ben Zurick emailed Jacobs about the required minimum distribution from the inherited IRA, and noted that the inherited IRA is doing very well, and that "it is a great opportunity right now to invest as the market is down, everything is on sale." He further advised that her sub-trust is invested in Federate Prime Cash Obligation Fund and that is really just to preserve its value, and interest is at an all-time low, so you won't be gaining much." No action was taken by Watson to invest the assets, and instead they remained

in cash equivalents.

39. On July 13, 2020, Gazder sends Jacobs an email stating that they should "discuss goals for the money in the three accounts." He also expressed surprise that Jacobs was not receiving, and had not received, statements for the accounts for some time. Watson interjected and advised that "all communications need to go through the trustee, that being me."

40. On October 22, 2020, Jacobs emailed Gazder and Watson to request a conference call about the statements. On October 26, Jacobs sent another email following up about having a conference call, and noted that the monies in her sub-trust had been moved to a 90-day CD, with the remainder in cash, since money market interest rates had dropped. Once again, Jacobs expressed interest in investing the monies in productive assets.

41. On December 2, 2020, Gazder advised Jacobs that he was not comfortable advising Watson on how to invest the sub-trust for growth until he meets with her to discuss her goals and risk tolerance.

42. As of December 1 2020, the $1,000,000 in the sub-trust, plus an additional $5,166 in 2018 which funded the trust from another source, had grown only $1,035,501 ($5,166 of which was a prior deposit of funds from another source), which equates to a total return on investment of a mere 3.55%, or an annualized rate of 1.01% since the sub-trust was funded in September 2017. Indeed, in that same period, the Dow Jones had returned nearly 46%.

43. Based upon the failure to invest the $1,005,166 in a productive fashion, on December 3, 2020, Jacobs asked Watson if it would be wiser to pay off Jacobs' mortgage on her home because Jacobs was paying more interest on her $350,000 mortgage than the entire Trust was earning. Jacobs requested the remainder to be invested in moderate risk equities for growth. Watson refused, and responded with a December 29, 2020 email stating that she would only

consider discussions regarding any distribution or investment strategy if Jacobs provided a signed consent and release relieving her and Robert F. Henderson from all liability related to a separate irrevocable trust and the Trust.

44. Presently, the $1,000,000 is still invested in CDs earning nominal interest. Had it been invested in the same holdings as found in the inherited IRA, then it would be worth over $1,450,000. Instead, it earned less than $35,000.

45. Despite her blatant mismanagement of the sub-trust, on March 10, 2021, Watson advised Jacobs that she intended to take a fee for her services as Trustee for the years 2018-2020.

## FIRST CAUSE OF ACTION
**(Breach of Trust/Violation of Prudent Investor's Act, Ohio Rev. Code § 5809.01 et seq.)**

46. Jacobs incorporates by reference the allegations set forth in the foregoing paragraphs as if fully rewritten herein.

47. Ohio Rev. Code § 5809.02 provides:

> (A)    A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this requirement, the trustee shall exercise reasonable care, skill, and caution.
>
> (B)    A trustee shall make a reasonable effort to verify facts relevant to the investment and management of trust assets.
>
> (C)    A trustee's investment and management decisions respecting individual trust assets shall not be evaluated in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust.
>
> (D)    Among circumstances that a trustee shall consider in investing and

9

managing trust assets are the following as are relevant to the trust or its beneficiaries:

 (1) The general economic conditions;

 (2) The possible effect of inflation or deflation;

 (3) The expected tax consequences of investment decisions or strategies;

 (4) The role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property, and real property;

 (5) The expected total return from income and appreciation of capital;

 (6) Other resources of the beneficiaries;

 (7) Needs for liquidity, regularity of income, and preservation or appreciation of capital;

 (8) An asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

48. Watson violated these provisions by failing to invest the $1,000,000 in the sub-trust in a prudent manner, and by failing to consider the purposes, terms, distribution requirements, and other circumstances of the trust.

49. Watson failed to make investment decisions in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

50. Watson, as trustee, failed to consider the general economic conditions at the time, which clearly favored investing the assets in equities or other income-producing assets.

51. Watson failed to take into account possible effect of inflation or deflation, for she invested the money in cash or cash equivalents that would not keep up with inflation.

52. Watson failed to take into account the expected total return from income and appreciation of capital, for those investments earned, in over four years, just over 3% while the market experienced exponential growth.

53. Watson failed to take into account Jacobs' age, her need for capital appreciation, her financial resources, or the appreciation of capital.

54. Watson ignored the advice of Ameriprise representatives, who continually advised of investment opportunities at times when the market was ripe for appreciation.

55. Instead of evaluating these things, Watson simply left the assets in cash or cash equivalents, while incorrectly claiming that she cannot and would not be held liable for the fund's performance, and while routinely threatening to either resign as the trustee, or strongarming Jacobs to sign a release absolving her of liability.

56. As a result of Watsons' conduct, Jacobs has been injured in an amount in excess of $25,000 in an amount to be determined at trial.

57. Watson's conduct was reckless, willful and wanting, thereby entitling Jacobs to punitive damages.

58. Pursuant to Ohio Rev. Code § 5810.04, plaintiff is entitled to attorneys' fees as this action has benefitted the trust.

59. Pursuant to Ohio Rev. Code § 5810.04, Jacobs is entitled to removal of Watson as trustee, and denial of compensation to Watson.

## COUNT TWO
### Breach of Fiduciary Duty/Breach of Trust

60. Watson owed and continues to owe a heightened fiduciary duty to Jacobs in her capacity

11

as trustee of the Trust.

61. As more fully described above, Watson breached her fiduciary duty of good faith and loyalty by, among other things, disclaiming any liability for the trust, or its performance, all while protecting her own interest by insisting on a release of liability before engaging in her duties associated with the Trust and sub-trust.

62. Pursuant to Ohio Rev. Code § 5808.01, Watson had a duty to administer the trust in good faith, in accordance with its terms and purposes, and solely for the interests of the beneficiaries.

63. Pursuant to Ohio Rev. Code § 5808.04, Watson had a duty to administer the trust as a prudent person would and shall consider the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.

64. As more fully described above, Watson, as a trustee of the Trust, breached her fiduciary duties of good faith and loyalty by, among other things, failing and/or refusing to take any action to prudently invest the assets of the trust, and instead leaving the corpus in cash or cash equivalents.

65. As more fully described above, Watson, as a trustee of the Trust, breached her fiduciary duties of good faith and loyalty by, among other things, failing and/or refusing to provide financial statements relating to the corpus of the sub-trust, and by threatening to resign as trustee unless Jacobs signed a release of her liability so as to turn the sub-trust over to Jacobs for her own management.

66. As a direct and proximate result of these breaches of Watson's fiduciary duty of good faith and loyalty, Jacobs has suffered damages in excess of $25,000.00.

**THIRD CAUSE OF ACTION**
(Accounting)

67. Jacobs incorporates by reference the allegations set forth in the foregoing paragraphs as if fully rewritten herein.

68. Watson purposefully withheld information pertaining to the assets in the Trust by refusing to provide statements identifying the investment of sub-trust assets, and breached her fiduciary duties to Jacobs as aforesaid.

69. Jacobs has been deprived of critical information concerning her residuary interest in the sub-trust assets pursuant to Ohio Revised Code § 5808.13(A).

70. Indeed, from 2016 until 2018, Jacobs was unaware that the assets in the trust were not being invested in income producing assets, and instead were in cash or cash equivalents earning nominal interest. When Jacobs inquired concerning investing on more productive assets, Watson instead stated that she would consider allowing Jacobs to form her own trust, but only if she was released from liability. When that didn't materialize, Watson nevertheless continued to mismanage the trust assets by failing to prudently invest them.

71. By necessity, Jacobs is entitled to an accounting with respect to all assets of the Trust and the sub-trust. Jacobs has made demands for an accounting previously, but such demands have been refused.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Linda Jacobs prays that this Court enter judgment against the Defendants in the following manner:

    A.    An award of damages,

    D.    Prejudgment and post-judgment interest;

    E.    Punitive damages and/or treble liquidated damages pursuant to ORC 2307.61;

F.      An award of all costs and attorney's fees in this matter, including recoupment of any monies taken from the Trust by the Trustee for defense;

G.      Removal of Watson as Trustee and an order appointing Jacobs as sole trustee of her Trust and denial of management fees; and

G.      All other relief, legal or equitable, to which Jacobs is entitled.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Date: April 2, 2021

Respectfully submitted,

/s/ Bryce A. Lenox
Bryce A. Lenox (0069936)
THE LAW OFFICE OF BRYCE A. LENOX,
ESQ. LLC
3825 Edwards Road, Suite 103
Cincinnati, Ohio 45209
(513) 520-9829
bryce@brycelenoxlaw.com

Attorney for Plaintiff
